Gabriel NUNEZ, a minor, by Rene NUNEZ, his guardian ad litem; Jennifer Lin–Liu, a minor by Sen Lin–Lieu, her guardian ad litem; Alleyn Evans, a minor by Michael Evans, her guardian ad litem; David Pressman, a minor, by Joel M. Pressman, his guardian ad litem, Terra Lawson–Remer, a minor, by Shari Lawson, her guardian ad litem; Natalie Del Muro; Asha Settimo, a minor, by Amber Sidhu, her guardian ad litem; Amber Sidhu; Patrick Maher, Plaintiffs–Appellants,

v.

CITY OF SAN DIEGO; Susan Golding, in her official capacity as Mayor of the City of San Diego; Jerry Sanders, in his official capacity as Chief of Police for the City of San Diego, Defendants–Appellees.

No. 96–55290.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 6, 1997.

Decided June 9, 1997.

Jordan C. Budd, ACLU Foundation of San Diego, San Diego, California, Lane L. McVey, Juanita R. Brooks, and John Dillon Clarke, McKenna & Cuneo, San Diego, California, and Michael R. Marrinan, Adler & Marrinan, San Diego, California, for the plaintiffs-appellants.

James M. Chapin, Deputy City Attorney, San Diego, California, for the defendants-appellees.

Before SCHROEDER, WIGGINS, LEAVY, Circuit Judges.

WIGGINS, Circuit Judge.

Plaintiffs challenge the constitutionality of the City of San Diego's juvenile curfew ordinance. The district court granted summary judgment for the City, and plaintiffs appealed. We have jurisdiction under 28 U.S.C. § 1291. We reverse.

## THE ORDINANCE

The City of San Diego enacted its juvenile curfew ordinance in 1947. The ordinance reads as follows:

> It shall be unlawful for any minor under the age of eighteen (18) years, to loiter, idle, wander, stroll or play in or upon the public streets, highways, roads, alleys, parks, playgrounds, wharves, docks, or other public grounds, public places and public buildings, places of amusement and entertainment, vacant lots or other unsupervised places, between the hours of ten o'clock P.M. and daylight immediately following. . . .

San Diego, Cal., Municipal Code Art. 8, § 58.01. The ordinance then provides that the curfew does not apply in four situations:

(1) "when the minor is accompanied by his or her parents, guardian, or other adult person having the care and custody of the minor,"

(2) "when the minor is upon an emergency errand directed by his or her parent or guardian or other adult person having the care and custody of the minor,"

(3) "when the minor is returning directly home from a meeting, entertainment or recreational activity directed, supervised or sponsored by the local educational authorities," or

(4) "when the presence of such minor in said place or places is connected with and required by some legitimate business, trade, profession or occupation in which said minor is lawfully engaged."

*Id.* A minor violating § 58.01 commits a misdemeanor. *Id.* § 58.01.2. Section 58.01.1 also creates criminal liability for the "parent, guardian or other adult person having the care and custody of a minor" who permits or allows the minor to violate the curfew ordinance. On April 25, 1994, the City adopted a resolution to enforce the curfew aggressively.

### PRIOR PROCEEDINGS

Plaintiffs are minors and parents of minors from San Diego. They brought an action under 42 U.S.C. § 1983 to challenge the ordinance's constitutionality on its face. Plaintiff minors allege, among other things, that the ordinance restricts them from many otherwise lawful activities after curfew hours, i.e., volunteering at a homeless shelter, attending concerts as a music critic, studying with other students, meeting with friends at their homes or in coffee houses, stopping at a restaurant to eat dinner after serving on the School District Board, auditioning for theater parts, attending ice hockey practice, practicing astronomy, and dancing at an under–21 dance club. Plaintiff parents allege that the ordinance impinges upon their ability to rear their children as they wish because they and their children would face misdemeanor liability under the curfew.

The district court granted summary judgment in favor of the City, concluding that the ordinance was constitutional. It held that the ordinance prohibited only aimless nocturnal conduct in public. Thus, the district court concluded that the curfew imposed only a minimal burden on minors and their parents and was narrowly tailored to address the City's compelling interest in reducing juvenile crime and victimization. This appeal followed. Amicus briefs in support of the City were filed by the American Alliance for Rights and Responsibilities ("AARR") and by

Bakersfield and 113 other California cities ("California amici").

### PRELIMINARY ISSUES

▉ Before turning to the merits of the appeal, we reach two preliminary issues regarding the appropriateness of our review. The City does not challenge on appeal the district court's finding that plaintiffs had standing. We briefly discuss the issue, however, as we must independently examine whether we have jurisdiction. *Indian Oasis–Baboquivari Unified Sch. Dist. v. Kirk,* 109 F.3d 634, 636 (9th Cir.1997) (en banc). When a case becomes moot on appeal, the general practice is to vacate or reverse the judgment below and remand with a direction to dismiss. *Arizonans for Official English v. Arizona,* —— U.S. ——, ——, 117 S.Ct. 1055, 1071, 137 L.Ed.2d 170 (1997) ("*Arizonans*"). This is not a class action, so the minors' claims become moot once they reach age eighteen. Similarly, their parents' claims would be moot except to the extent the parents are still subject to liability for other minor children whose actions are made unlawful by the curfew. At present, however, this action is not moot because at least one of the minors, Asha Settimo, is not yet eighteen and her parent, Amber Sidhu, is also a named plaintiff.

▉ We must be cautious in determining the constitutionality of a municipal ordinance where the state supreme court has not provided a controlling interpretation of its meaning. *Coalition for Economic Equity v. Wilson,* 110 F.3d 1431, 1437 (9th Cir. 1997) (citing *Arizonans,* —— U.S. at —— –——, 117 S.Ct. at 1073–74).[1] The Supreme Court has made clear that we first should ask ourselves "Is this conflict really necessary?" *Arizonans,* —— U.S. at ——, 117 S.Ct. at 1072. In this case, we find that the ordinance suffers constitutional deficiencies regardless of which of the two proffered interpretations of the basic prohibition is accepted. We conclude that no construction is "fairly possible that will contain the statute

---

1. The ordinance is a municipal, not state, law; the analytical approach is the same, however. State courts are the ultimate authority over the ordinance's meaning. *See Village of Hoffman*

*Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982) (analyzing municipal ordinance).

within constitutional grounds." *Id.* at ——, 117 S.Ct. at 1074 (internal quotation omitted). As explained below, giving the ordinance's general prohibition a narrow construction renders it unconstitutionally vague. Under a broader construction, the ordinance does not survive strict scrutiny because it is not narrowly tailored to meet the City's compelling interests. Thus, awaiting a definitive interpretation of the ordinance by the California Supreme Court will not avoid the federal constitutional infirmities of the ordinance, and we answer in the affirmative the threshold query about the necessity of this conflict.

### ANALYSIS OF THE MERITS

■ We review *de novo* an order granting summary judgment on the constitutionality of a statute or ordinance. *See Valley Bank of Nev. v. Plus Sys., Inc.,* 914 F.2d 1186, 1189 (9th Cir.1990). The constitutionality of any juvenile curfew is a matter of first impression in this circuit.[2]

### I. THE VAGUENESS DOCTRINE

■ "The void-for-vagueness doctrine incorporates several important due process principles." *Finley v. National Endowment for the Arts,* 100 F.3d 671, 675 (9th Cir.1996). To avoid unconstitutional vagueness, an ordinance must (1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). In a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches a "substantial amount of constitutionally protected conduct." *Id.* at 359 n. 8, 103 S.Ct. at 1859 n. 8

(quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982)). The need for definiteness is greater when the ordinance imposes criminal penalties on individual behavior or implicates constitutionally protected rights than when it regulates the economic behavior of businesses. *Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. at 1193–94. This greater need for definiteness is present in this case because the San Diego ordinance restricts individual freedom through criminal law.

■ For the reasons explained below, we conclude that the plain language of the ordinance when read as a whole is vague. We reject the argument that the ordinance is saved by a narrowing construction of the phrase "loiter, wander, idle, stroll or play" made by the California courts because that construction itself does not survive constitutional scrutiny on vagueness grounds.

The key to determining whether the San Diego ordinance is unconstitutionally vague is to determine the breadth of the ordinance's basic proscription in light of the enumerated exceptions. The City contends that the ordinance's language making it unlawful to "loiter, idle, wander, stroll or play" in public areas during the curfew is more limited than a proscription of minors' presence. Thus, City stated at oral argument that the limited nature of the language "loiter, wander, idle, stroll or play," and not just the enumerated exceptions, provides exceptions for legitimate conduct that ensure that the curfew is not overbroad.

The phrase "loiter, wander, idle, stroll or play" uses imprecise terms. As a result, serious vagueness problems exist if "loiter, wander, idle, stroll or play" covers a narrower range of conduct than "presence," unless a

---

**2.** Six federal cases have fully analyzed the constitutionality of juvenile curfews. Of the six, four struck down the ordinances. *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir.1981); *Hutchins v. District of Columbia,* 942 F.Supp. 665 (D.D.C.1996); *Waters v. Barry,* 711 F.Supp. 1125 (D.D.C.1989); *McCollester v. City of Keene,* 586 F.Supp. 1381 (D.N.H.1984). The other two upheld curfew ordinances that had greater exemptions for legitimate activities, including the exercise of First Amendment rights, than does the

San Diego ordinance. *Qutb v. Strauss,* 11 F.3d 488 (5th Cir.1993); *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1246 (M.D.Pa.1975), *aff'd,* 535 F.2d 1245 (3d Cir.) (1976). Another case struck down a curfew for vagueness because it did not specify the time each day that the curfew ended. *Naprstek v. City of Norwich,* 545 F.2d 815, 818 (2d Cir.1976). In analyzing this case, we have in part drawn from the analyses in these prior cases.

sufficiently definite narrowing construction is given. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 163–71, 92 S.Ct. 839, 843–48, 31 L.Ed.2d 110 (1972) (discussing vagueness problems with similar terms); *United States ex rel. Newsome v. Malcolm*, 492 F.2d 1166, 1172–73 (2d Cir.1974) (concluding that a statute using terms "loiter" and "wander" is unconstitutionally vague), *aff'd sub nom. Lefkowitz v. Newsome*, 420 U.S. 283, 95 S.Ct. 886, 43 L.Ed.2d 196 (1975) (addressing separate question only).

We cannot accept as constitutionally definite the district court's construction of the ordinance. The district court concluded that "loiter, wander, idle, stroll or play" means "hanging out." The district court did not explain its meaning further, except to say that it "requires a degree of aimlessness." The problem with narrowing constructions such as "hanging out" and "aimless conduct" is that they are as inherently vague as the phrase "loiter, wander, idle, stroll or play" itself. *See Streetwatch v. National R.R. Passenger Corp.*, 875 F.Supp. 1055, 1063 (S.D.N.Y.1995) (concluding that an Amtrak station rule against "hanging out" was unconstitutionally vague).

Examination of the ordinance's enumerated "exceptions" highlights the indefiniteness of the phrase "loiter, wander, idle, stroll or play." If the ordinance's general prohibition only proscribes "hanging out" or "aimlessness," then three of the ordinance's four enumerated exceptions are surplusage. In fact, the City admitted at oral argument that under its narrow reading of the ordinance's prohibition these three exceptions would be "probably totally unnecessary," although it suggested that they might give additional "guidance."

First, if "loiter, wander, idle, stroll or play" means "hanging out," then the exception for returning directly home from certain education-related activities is superfluous. In reading the basic prohibition narrowly, the district court concluded that walking to the store, walking to one's car to drive home, driving, and traveling to or from any recreational activity do not constitute activities in violation of the ordinance. These conclusions regarding the scope of the prohibition are inconsistent with an exception for returning directly home from education-related activities.[3] The exception as written makes sense only if the general prohibition on "loiter, wander, idle, stroll or play" is broader than "hanging out," which itself does not implicate returning directly home from anything. Contrary to the City's argument, returning directly home from aimless activity is not itself aimless. Moreover, we note that on October 3, 1994, San Diego rejected an amendment to make it a defense that the minor was responsibly moving to or from any legitimate social activity, which implies that such movement would violate the ordinance.

Second, a narrow construction of "loiter, wander, idle, stroll or play" is inconsistent with the exception for emergency errands. The City contends that the exception protects activity in the course of an emergency errand that might appear to be aimless. The curfew does not prohibit the appearance of loitering, however, but rather loitering itself. Accordingly, with or without the exception, an emergency errand would not violate the ordinance under the City's narrow reading; a narrow reading makes the exception surplusage.

Third, the exception for a job-related activities would be surplusage under a narrow reading of "loiter, wander, idle, stroll or play." If the ordinance proscribes only "hanging out" or similar aimless conduct, then a job-related exception makes no sense. Only if the ordinance is construed to prohibit minors' presence after curfew is the job-related exception reasonable and meaningful. In sum, the plain language of the ordinance's three exceptions makes sense only if "loiter, wander, idle, stroll or play" is broadly interpreted.

---

**3.** While this is a facial challenge, it is instructive to note that plaintiff Michael Evans submitted a declaration stating that his daughter was stopped while walking to her car to drive home, indicating that the district court's holding does not accord with actual police practice. *Cf. Roulette v. City of Seattle*, 97 F.3d 300, 304 n. 7 (9th Cir.1996) (noting potential "as applied" claim not reviewable on facial challenge).

Our analysis does not end with the plain language of the ordinance, however. For purposes of determining whether San Diego's juvenile curfew ordinance is unconstitutionally vague, we must construe the ordinance as it has been interpreted by the California state courts. *Kolender*, 461 U.S. at 355 n. 4, 103 S.Ct. at 1857 n. 4; *McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir.1989). We are not similarly bound, however, to the state court's analysis of the constitutional effect of that construction. *Id.* at 1053. Nonetheless, we must accept a narrowing construction to uphold the constitutionality of an ordinance if its language is "readily susceptible" to it. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988).

To provide a narrowing construction to the phrase "loiter, wander, idle, stroll or play," the City principally relies on *In re Nancy C*, 28 Cal.App.3d 747, 105 Cal.Rptr. 113, 120 (1972), a California intermediate appellate court decision. The court in *Nancy C* held that a Sacramento ordinance similar to San Diego's does *not* restrict minors from going to, coming from, or being at night classes, library study, games, dances or other school activities, church functions or the theater. It concluded that the ordinance was not unconstitutional because it was a "loitering"-type statute, which proscribed a narrower range of conduct than a "presence"-type statute. *Id.* 105 Cal.Rptr. at 119–20; *see also People v. Teresinski*, 30 Cal.3d 822, 180 Cal.Rptr. 617, 621, 640 P.2d 753, 757 (1982) (stating that "loiter, wander, idle, stroll or play" is not the same as presence, although not addressing a vagueness challenge). The court in *Nancy C* does not explain what more than mere presence is required to violate the ordinance, however, stating only that "the words taken together and used in their ordinary sense prohibit tarrying and remaining in

place and not merely being present." 105 Cal.Rptr. at 120; *accord People v. Walton*, 70 Cal.App.2d Supp. 862, 161 P.2d 498, 501 (1945).

Further review of California caselaw provides little additional guidance. The California Supreme Court has provided a narrowing construction for the term "loiter," holding that the word "loiter" has a sinister connotation, even as used in a juvenile curfew. *Teresinski*, 180 Cal.Rptr. at 621, 640 P.2d at 757. *See also People v. Superior Court (Caswell)*, 46 Cal.3d 381, 250 Cal.Rptr. 515, 518–20, 758 P.2d 1046, 1049–50 (1988) (stating that a sinister intent requirement may avoid vagueness concerns about a law that prohibited "loitering" with the intent to commit a lewd act); *cf. Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. at 1193–94 (noting that a scienter requirement may mitigate a law's vagueness). The court in *Teresinski* did not determine whether to give the terms "idle, wander, stroll or play" the same narrowing construction. 180 Cal.Rptr. at 621, 640 P.2d at 757. But beyond giving an intent requirement to one of the ordinance's five prohibited activities, the California Supreme Court provides little else to narrow or define the phrase's meaning. In a footnote, the court further states that the language of a juvenile curfew ordinance which makes it illegal to loiter, idle, wander, stroll or play "cannot reasonably be construed to ban conduct than does not fall within its specific terms." *Id.* 180 Cal.Rptr. at 621 n. 5, 640 P.2d at 757 n. 5. This statement, of course, does not answer the question of what the "specific terms" mean.

Thus, examining California law makes it clear that the phrase "loiter, wander, idle, stroll or play" taken as a whole means something different than "presence," but what the relevant difference is remains unclear.[4] We

---

4. We note two later California appellate court decisions on juvenile curfews that have been ordered not published. *In re Daniel W*, 41 Cal. Rptr.2d 202 (Cal.Ct.App.), *review granted*, 44 Cal. Rptr.2d 351, 900 P.2d 600 (Cal.1995), *appeal dismissed but request for an order directing republication of opinion below denied*, 49 Cal.Rptr.2d 206, 909 P.2d 328 (Cal.1996); *In re Frank O*, 247 Cal.Rptr. 655 (Cal.Ct.App.), *review denied and ordered not published*, (Cal.1988). Although we are not precluded from considering unpublished

state court opinions, *see McSherry*, 880 F.2d at 1052–53 n. 2, we are not bound by them either. Consideration of the cases would not lead us to reconsider our analysis in any event. The court in *Frank O* found that the term "loiter" was unconstitutionally vague because it was unclear what other than mere "presence" was being prohibited, a conclusion consistent with our own. 247 Cal.Rptr. at 658. In *Daniel W*, the court rejected an overbreadth challenge to a juvenile

cannot certify this matter to the California Supreme Court for a construction of the ordinance because California does not have a certification process for state law questions raised in federal court. *See Kopp v. Fair Political Practices Comm'n,* 11 Cal.4th 607, 47 Cal.Rptr.2d 108, 115–16, 905 P.2d 1248, 1256 (1995); *Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1093 (9th Cir.1990).

The narrow construction of the ordinance offered by the City is irreducibly subjective and renders most of the exceptions incoherent. Thus, we conclude that the phrase "loiter, wander, idle, stroll or play" is unconstitutionally vague.[5] The ordinance's first failing is that it does not provide reasonable notice of what conduct is illegal and allows excessive discretion to the police if we construe "loiter, wander, idle, stroll or play" to proscribe a narrower range of conduct than mere "presence." *See Kolender,* 461 U.S. at 357 & 361, 103 S.Ct. at 1858 & 1860; *Papachristou,* 405 U.S. at 165–171, 92 S.Ct. at 845–48. *See also K.L.J. v. State,* 581 So.2d 920, 922 (Fla.Dist.Ct.App.1991) (finding that curfew ordinance unconstitutionally vague); *Seattle v. Pullman,* 82 Wash.2d 794, 514 P.2d 1059, 1063 (1973) (finding that the phrase "loiter, wander, idle, stroll, or play" was impermissibly vague); Michael Jordan, *From the Constitutionality of Juvenile Curfew Ordinances to a Children's Agenda for the 1990's: Is It Really a Simple Matter of Supporting Family Values and Recognizing Fundamental Rights?,* 5 St. Thomas L.Rev. 389, 398 (1993) (stating that the distinction between presence and loitering has been largely abandoned because it is too difficult to discern).

The ordinance's second failing is that it allows the police excessive discretion to decide whether to stop and arrest juveniles after curfew hours. Such tremendous discretion may be an effective enforcement tool, but where the ordinance provides no standards to distinguish prohibited and permitted conduct it is impermissibly vague. The City's narrow construction of the ordinance makes the general prohibition standardless, relying on the police officer's perception of whether conduct is aimless. We reject the City's reliance on the claimed legitimacy of its present enforcement policy; its policy may change, and we must instead focus on the constitutionality of the ordinance itself.

Despite the vagueness of the phrase "loiter, wander, idle, stroll or play," the ordinance might avoid being rendered unconstitutional on vagueness grounds if the ordinance is treated as prohibiting all juvenile nocturnal presence and if that broad interpretation does not unconstitutionally burden the rights of minors and their parents. *See Bykofsky,* 401 F.Supp. at 1252 (treating "remain" as meaning "presence" despite juvenile curfew ordinance's expressed intent to use it more narrowly because broader meaning was required in face of vagueness challenge); *People v. Trantham,* 161 Cal.App.3d Supp. 1, 208 Cal.Rptr. 535, 538 (1984) (rejecting facial vagueness challenge regarding term "loiter" because the statute was "simply a park closure law" banning presence); *cf. United States v. Harriss,* 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) (stating that courts have a duty to make a "reasonable construction" of the statute to make it constitutionally definite). This broader reading may make it more difficult for the statute to pass constitutional

curfew, noting the distinction between "loiter-" and "presence"-type statutes. The court did not, however, articulate any more definite construction of the meaning of "loiter" than did the court in *Nancy C. See Daniel W,* 41 Cal.Rptr.2d at 207.

Of course we do not, and indeed could not, foreclose the possibility that the California Supreme Court may in some future case articulate a narrowing construction for the phrase "loiter, wander, idle, stroll or play" that explains the difference from mere presence.

**5.** The district court erred when it held that the United States Supreme Court had found "loiter"

to be definite simply because the statute in *Kolender* used that term. As the district court recognized, the parties in *Kolender* did not contest the vagueness of the term "loiter," *Kolender,* 461 U.S. at 353 n. 1, 103 S.Ct. at 1856 n. 1; thus, the Supreme Court did not in fact "reflect[ ] the propriety" of the term as believed by the district court. *See also McSherry,* 880 F.2d at 1055 (similarly, not addressing definiteness of term "loiter" although rejecting on other grounds a vagueness challenge to a statute that used the term).

muster on substantive grounds, but it is required for the ordinance to meet the Constitution's guarantee of fair notice.

## II. EQUAL PROTECTION ANALYSIS

Plaintiffs challenge the curfew ordinance under the Equal Protection Clause of the Fourteenth Amendment. The standard for reviewing the constitutionality of an ordinance depends on the right or classification involved.

### A. The Appropriate Level of Scrutiny

Generally, legislation is presumed to pass constitutional muster and will be sustained if the classification drawn by the statute or ordinance is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3253–55, 87 L.Ed.2d 313 (1985). If the classification disadvantages a "suspect class" or impinges a "fundamental right," the ordinance is subject to strict scrutiny. *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). Because age is not a suspect classification, distinctions based on age are subject to rational basis review. *Gregory v. Ashcroft,* 501 U.S. 452, 470, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991). Plaintiffs argue, however, that strict scrutiny should apply because the ordinance infringes on fundamental rights protected by the Constitution: the right of free movement and the right to travel, as well as First Amendment rights, which we discuss separately in Part III.[6]

Citizens have a fundamental right of free movement, "historically part of the amenities of life as we have known them." *Papachristou,* 405 U.S. at 164, 92 S.Ct. at 844; *see also United States v. Wheeler,* 254 U.S. 281, 293, 41 S.Ct. 133, 134, 65 L.Ed. 270 (1920) ("In all the [s]tates from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective [s]tates, to move at will from place to place therein, and to have free ingress thereto and egress therefrom...."). Similarly, the Constitution guarantees the fundamental right to interstate travel. *Shapiro v. Thompson,* 394 U.S. 618, 629, 89 S.Ct. 1322, 1328–29, 22 L.Ed.2d 600 (1969).[7]

The City and its amici contend that these are not fundamental rights for minors because minors are traditionally treated differently than adults. The City heavily relies on *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), to show that "unemancipated minors lack some of the most fundamental rights of self-determination-including even the right of liberty in its narrow sense, i.e., the right to come and go at will." [8] *Id.* at ——, 115 S.Ct. at 2391. The City takes *Vernonia*'s statement out of context. In the next sentence the Court explains that children "are subject, even as to their physical freedom, to the control of their parents or guardians." *Id.* Because parental power is not subject to the constitutional constraints of state power, *id.*

---

**6.** The rights of free movement and travel and the right to free expression are integral to our analysis of the whether the ordinance unconstitutionally burdens minors' fundamental rights. We discuss them separately for clarity's sake; courts have articulated different tests to examine burdens on First Amendment rights and on other fundamental rights.

**7.** Other circuit courts are split as to whether the Constitution guarantees the fundamental right of intrastate travel. *See Townes v. City of St. Louis,* 949 F.Supp. 731, 734–35 (E.D.Mo.1996) (not finding such a right and listing cases showing split between the First, Second and Third Circuits finding such a right generally and the Fifth, Sixth, and Seventh Circuits not finding such a right), *aff'd mem.,* 112 F.3d 514, 1997 WL 210442 (8th Cir. Apr.29, 1997). The Supreme

Court has declined to decide the issue. *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 255–56, 94 S.Ct. 1076, 1080–81, 39 L.Ed.2d 306 (1974); *but cf. Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 277 & n. 7, 113 S.Ct. 753, 763–64 & n. 7, 122 L.Ed.2d 34 (1993) (commenting in a section 1983 case against private individuals protesting abortion that a purely intrastate restriction does not violate the right to interstate travel). We need not decide the issue in order to resolve this appeal, so we express no opinion on it.

**8.** The San Diego ordinance has no exception for emancipated minors. The City does not address any possible differences in the justification for restrictions on emancipated and unemancipated minors.

at ——————, 115 S.Ct. at 2391–92, minors' lack of rights *vis-a-vis* parents does not necessarily show that they lack those rights *vis-a-vis* the state. The Court emphasized the school district's "custodial and tutelary responsibility for children," noting that constitutional rights are different in public schools than elsewhere. *Id.* at ——, 115 S.Ct. at 2392. *See also Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993). We decline to extend *Vernonia* to establish that the Constitution does not secure minors' fundamental right to free movement against the government acting without regard to the parents' wishes. *See Hutchins,* 942 F.Supp. at 672 (similarly declining to extend *Vernonia* ).

■ Although many federal courts have recognized that juvenile curfews implicate the fundamental rights of minors,[9] the parties dispute whether strict scrutiny review is necessary. The Supreme Court teaches that rights are no less "fundamental" for minors than adults, but that the analysis of those rights may differ:

> Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights. The Court indeed, however, long has recognized that the State has somewhat broader authority to regulate the activities of children than of adults. It remains, then, to examine whether there is any significant state interest in [the effect of the statute] that is not present in the case of an adult.

Planned Parenthood of Cent. Missouri v. Danforth, 428 U.S. 52, 74–75, 96 S.Ct. 2831, 2843–44, 49 L.Ed.2d 788 (1976) (citations omitted). Thus, minors' rights are not coextensive with the rights of adults because the state has a greater range of interests that justify the infringement of minors' rights. *See also* Note, *Assessing the Scope of Minors' Fundamental Rights: Juvenile Curfews and the Constitution,* 97 Harv.L.Rev. 1163, 1172 (1984).[10]

The Supreme Court has articulated three specific factors that, when applicable, warrant differential analysis of the constitutional rights of minors and adults: (1) the peculiar vulnerability of children; (2) their inability to make critical decisions in an informed, mature manner; and (3) the importance of the parental role in child rearing. *Bellotti v. Baird,* 443 U.S. 622, 634, 99 S.Ct. 3035, 3044–45, 61 L.Ed.2d 797 (1979). The *Bellotti* test does not establish a lower level of scrutiny for the constitutional rights of minors in the context of a juvenile curfew. Rather, the *Bellotti* framework enables courts to determine whether the state has a compelling interest justifying greater restrictions on minors than on adults. *Qutb,* 11 F.3d at 492 n. 6; Note, 97 Harv.L.Rev. at 1172–73; *cf. H.L. v. Matheson,* 450 U.S. 398, 441 n. 32, 101 S.Ct. 1164, 1188, 67 L.Ed.2d 388 (1981) (Marshall, J., dissenting) (citing *Danforth,* 428 U.S. at 74–75, 96 S.Ct. at 2843–44, and noting that an analysis of minors' rights should consider whether the state's interests may be more compelling but not whether the rights involved are less fundamental). Further, we reject the City's argument that *Vernonia* changes or abandons the *Bellotti* framework.

**9.** *See, e.g., Johnson,* 658 F.2d at 1072 (examining under overbreadth to see if statute was narrowly tailored); *Hutchins,* 942 F.Supp. at 672 (recognizing the rights are fundamental, even if not treated precisely the same as for adults); *Waters,* 711 F.Supp. at 1139; *McCollester,* 586 F.Supp. at 1384–85; *cf. Bykofsky,* 401 F.Supp. at 1265 (finding no fundamental rights at issue and applying rational basis review, but acknowledging that the Supreme Court had not yet established a framework to analyze minors' rights). *See also Qutb,* 11 F.3d at 492 (assuming without deciding that minors' right to freedom of movement is fundamental and therefore applying strict scrutiny).

**10.** This conceptual approach also consistently explains the reasoning behind other Supreme Court cases analyzing minors' rights. *See Ginsberg v. New York,* 390 U.S. 629, 636–37 & 643, 88 S.Ct. 1274, 1278–79 & 1282–83, 20 L.Ed.2d 195 (1968) (upholding prohibition on pornography sales to minors and stating that the state may restrict minors' rights more than adults' rights); *Prince v. Massachusetts,* 321 U.S. 158, 167–68, 64 S.Ct. 438, 442–43, 88 L.Ed. 645 (1944) (finding that state's interest in protecting children from "diverse interests of the street" justified restriction on selling street literature that would not have been permissible on adults).

946

*Accord Hutchins,* 942 F.Supp. at 673 (reaching same conclusion).

The Court has applied an intermediate scrutiny-determining whether the classification is substantially related to an important government interest-to certain disadvantaged classes that were not suspect classes and to important rights that were not fundamental rights. *See Plyler,* 457 U.S. at 223–24, 102 S.Ct. at 2397–98 (reviewing a burden on the right to public education for illegal immigrant minors); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (reviewing a gender classification); *Lalli v. Lalli,* 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978) (reviewing classification based on illegitimacy of children). Although the state may have a compelling interest in regulating minors differently than adults, we do not believe that this lesser degree of scrutiny is appropriate to review burdens on minors' fundamental rights. Thus, the district court erred in stating that minors' "circumscribed" liberty interest was not fundamental and could be subjected to intermediate scrutiny. The district court nevertheless correctly decided to apply strict scrutiny, despite its conclusion that a lower level of scrutiny was permissible.

Accordingly, we apply strict scrutiny to our review of the ordinance. In applying this standard, we are mindful that strict scrutiny in the context of minors may allow greater burdens on minors than would be permissible on adults as a result of the unique interests implicated in regulating minors. *See* Susan Freitas, Note, *After Midnight: the Constitutional Status of Juvenile Curfew Ordinances in California,* 24 Hastings Const. L.Q. 219, 230–31 (1997); Note, 97 Harv.L.Rev. at 1169 nn. 34–35.

## B. STRICT SCRUTINY REVIEW OF THE ORDINANCE

In order to survive strict scrutiny, the classification created by the juvenile curfew ordinance must be narrowly tailored to promote a compelling governmental interest. *Plyler,* 457 U.S. at 217, 102 S.Ct. at 2395. To be narrowly tailored, there must be a sufficient nexus between the stated government interest and the classification created by the ordinance. *Id.* at 216–17, 102 S.Ct. at 2394–95.

### (1) Compelling Governmental Interest

The ostensible purposes of the ordinance identified by the City in its brief are to protect children from nighttime dangers, to reduce juvenile crime, and to involve parents in control of their children. At oral argument, the City admitted that its "compelling interest is, quite frankly, to reduce gang activity." As the City also admits, however, the ordinance is not limited to gang activities.

The City has a compelling interest in protecting the entire community from crime, *Schall v. Martin,* 467 U.S. 253, 264, 104 S.Ct. 2403, 2409–10, 81 L.Ed.2d 207 (1984), including juvenile crime. The City's interest in protecting the safety and welfare of its minors is also a compelling interest. *See Qutb,* 11 F.3d at 492; *Hutchins,* 942 F.Supp. at 674; *Waters,* 711 F.Supp. at 1139. The fact that much of the perceived danger stems from gang activity does not lessen the nature of the City's interest in protecting the safety and welfare of minors, although it may affect the analysis of whether the ordinance is narrowly tailored, as discussed below in Part II.B(2).

Furthermore, the government may have a compelling interest in protecting minors from certain things that it does not for adults. *See Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989) (holding that a ban on dial-a-porn is not appropriate for adults, although it might be for minors). The City claims its interest in protecting minors from the dangers of public places at night is particularly compelling, for all the reasons set forth in *Bellotti* regarding differential treatment of minors.

As other courts have recognized, *Bellotti* does not set forth reasons that always justify greater restrictions on minors than adults; rather, *Bellotti* sets forth factors for determining whether the government has a greater justification for restricting minors than adults in the manner at issue. *E.g. Waters,* 711 F.Supp. at 1136–37. Our consideration

of the *Bellotti* factors leads to the conclusion that greater restrictions of minors may be justified because they have a greater vulnerability at night than do adults and because minors are not equally able as adults to make mature decisions regarding the safety of themselves and others. *See Prince,* 321 U.S. at 168, 64 S.Ct. at 443 (concluding that "the diverse influences of the street" pose greater danger to children than adults). Some courts have reached the opposite conclusion. *Johnson,* 658 F.2d at 1073; *Hutchins,* 942 F.Supp. at 673–74; *Waters,* 711 F.Supp. at 1137; *McCollester,* 586 F.Supp. at 1385. We agree with those courts that all citizens are vulnerable to crime at night and that minors' participation in many legitimate activities does not involve the kind of profound decisions of concern in *Bellotti.* Nonetheless, we find it unexceptional for the City to conclude that minors are more susceptible to the dangers of the night and are generally less equipped to deal with danger that does arise. Thus, the City may have a compelling interest in placing greater restrictions on minors than adults to insure the minors' own safety.

In sum, we find that the City has a compelling interest in reducing juvenile crime and juvenile victimization. We analyze below whether the particular restrictions of the ordinance are narrowly tailored to meet that interest.

### (2) Is the Ordinance Narrowly Tailored?

 Plaintiffs offer two reasons why the ordinance is not narrowly tailored: (1) the record reflects little statistical support for the efficacy of the curfew; and (2) the exceptions are too narrow to protect minors' fundamental rights.

### (a) Statistical Support for Curfew

Plaintiffs attack the City's reliance on national and local statistics to support a juvenile curfew as a narrowly tailored means to reduce juvenile crime and victimization. Although the Constitution does not require the government to produce "scientifically certain criteria of legislation," *Ginsberg,* 390 U.S. at 642–43, 88 S.Ct. at 1282, the City must "demonstrate that its classification is precisely tailored." *See Plyler,* 457 U.S. at 217, 102

S.Ct. at 2395; *see also Hutchins,* 942 F.Supp. at 678 (concluding that the District of Columbia could not adopt the curfew ordinance upheld in *Qutb* without its own evidence showing the particular effectiveness of a nocturnal juvenile curfew in meeting its compelling interests). The City offered several statistical reports to demonstrate that the juvenile curfew is a solution to rising juvenile crime and victimization.

The first piece of evidence is a Justice Department report on juvenile offenders and victims. It shows a rising juvenile crime rate in the nation as a whole but does not provide information specific to San Diego. It also shows that juvenile crime peaks at 3 p.m. and again around 6 p.m. We accept the relevancy of the national crime statistics regarding the general increase of dangers to minors and others, but the national statistics do not conclusively show that the nocturnal juvenile curfew is a narrowly tailored solution.

Second, the City provided the local statistics regarding juvenile crime and victimization; our review of this evidence yields mixed results. The City's October 3, 1994, resolution to continue the aggressive enforcement policy stated that the violent crimes and juvenile activity had decreased during curfew hours from the previous year. In contrast, a San Diego Police Department report dated August 16, 1995, stated that violent crimes had decreased for the third year in a row and that total crime decreased for the sixth consecutive year, thus weakening any link to the increased enforcement of the curfew that began in June 1994. The 1995 report also reveals that the percentage of juvenile victimization that occurred during curfew hours slightly increased in the year following the curfew initiative, that the decrease in overall victimization for adults was larger than for minors, and that only 15% of arrests for violent juvenile crimes occurred during curfew hours. The 1996 version of the Police Department's report better supports the City, revealing that from the first quarter of 1995 to 1996 the percentage of victimization that occurred during curfew hours dropped and showing a greater increase in arrests for violent crimes during curfew hours than during other hours.

Overall, the statistical evidence provides some, but not overwhelming, support for the proposition that a curfew will help reduce crime. The City makes little showing, however, that the nocturnal, juvenile curfew is a particularly effective means of achieving that reduction. *Compare Waters*, 711 F.Supp. at 1139–40 (finding no statistical support of necessary nexus) *with Qutb*, 11 F.3d at 493 (discussing specific statistical evidence that Dallas offered to support its curfew).

On the other hand, we reject the City's further justification that the ordinance has the additional beneficial deterrent effect of permitting police officers to get juveniles off the streets before crimes are committed. The Supreme Court has sharply critiqued this type of rationale as overinclusive, at least with respect to adults. *Papachristou*, 405 U.S. at 171, 92 S.Ct. at 848 ("The implicit presumption of these generalized vagrancy standards-that crime is being nipped in the bud-is too extravagant to deserve extended treatment."). Furthermore, the relatively light penalties imposed by the curfew are a small deterrent to crime when compared to the penalties for the actual crimes that the curfew ostensibly seeks to thwart. *See Waters*, 711 F.Supp. at 1139.

Notwithstanding our expressed concerns, we reject a challenge to the ordinance that is based on the argument that a curfew is not particularly effective at meeting the City's interest. The City has established some nexus between the curfew and its compelling interest of reducing juvenile crime and victimization. This is particularly true because of our conclusion that minors have a special vulnerability to the dangers of the streets at night. We will not dismiss the City's legislative conclusion that the curfew will have a salutary effect on juvenile crime and victimization.

### (b) The Scope of the Exceptions

In order to be narrowly tailored, the ordinance must ensure that the broad curfew minimizes any burden on minors' fundamental rights, such as the right to free movement. Thus, we examine the ordinance's exceptions to determine whether they sufficiently exempt legitimate activities from the curfew. *See Qutb*, 11 F.3d at 493–94 (stating that the curfew's exceptions were the "most important consideration" in its constitutional analysis of whether the curfew ordinance was narrowly tailored); *Johnson*, 658 F.2d at 1071 (noting lack of meaningful exceptions to justify curfew); *Hutchins*, 942 F.Supp. at 679 (finding that exceptions broader than those in the San Diego ordinance were still insufficient because they were too ill-defined); *Waters*, 711 F.Supp. at 1134 (characterizing a juvenile curfew with few exceptions as "a bull in a china shop of constitutional values"); *McCollester*, 586 F.Supp. at 1385.

The City contends that the ordinance has necessary exceptions for legitimate activity. Specifically, it contends, California law establishes the ordinance has an exception for the right to travel because the phrase "loiter, wander, idle, stroll or play" does not include driving at night under *Teresinski*, 180 Cal. Rptr. at 621, 640 P.2d at 757. The California Supreme Court was clear on this point; we accept its controlling interpretation that the ordinance does not prohibit nocturnal driving. That conclusion does not carry the day for the City, however. We have previously explained the vagueness of the ordinance's general prohibition language. Similarly, it is not clear whether a reasonable reading of *Teresinski* would extend this exclusion to cover all travelling, such as riding on public transportation or walking. In any event, *Teresinski* does little to ameliorate the ordinance's restrictions of minors' freedom of movement.

Clearly, San Diego could have enacted a narrower curfew ordinance that would pass constitutional muster. Its present ordinance is problematic because it does not provide exceptions for many legitimate activities, with or without parental permission. This is true even though minors may be uniquely vulnerable at night; the curfew's blanket coverage restricts participation in, and travel to or from, many legitimate recreational activities even those that may not expose their special vulnerability. *See Johnson*, 658 F.2d at 1073. In this regard, it is significant that San Diego rejected a proposal to tailor the ordinance more narrowly by adopting the broader exceptions used in the ordinance up-

held in *Qutb*. The City's failure to provide adequate exceptions not only excessively burdens minors' right to free movement, but it also excessively burdens their right to free speech, as explained in our separate discussion of the First Amendment in Part III, below.

We therefore conclude that the City has not shown that the curfew is a close fit to the problem of juvenile crime and victimization because the curfew sweeps broadly, with few exceptions for otherwise legitimate activity. The broad sweep of the ordinance is particularly marked for an ordinance aimed, as the City admitted, at illegal gang activity. The district court in *Waters* eloquently explained the constitutional difficulty with a juvenile curfew lacking adequate exceptions:

> The Court recognizes that, in the eyes of many, the crippling effects of crime demand stern responses. With the Act, however, the District has chosen to address the problem through means that are stern to the point of unconstitutionality. Rather than a narrowly drawn, constitutionally sensitive response, the District has effectively chosen to deal with the problem by making thousands of this city's innocent juveniles prisoners at night in their homes.

*Waters*, 711 F.Supp. at 1135. We conclude that the ordinance is not narrowly tailored to meet the City's compelling interests, as required by strict scrutiny. Thus, we hold that the ordinance is unconstitutional even if given a broad construction to avoid vagueness problems.

### III. MINORS' FIRST AMENDMENT RIGHTS AND THE OVERBREADTH DOCTRINE

We now explain our conclusion regarding plaintiff minors' fundamental First Amendment rights, which are incorporated against the states by the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *Thorn-*

*hill v. Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 740–41, 84 L.Ed. 1093 (1940). Specifically, we address whether the ordinance's restrictions on legitimate exercise of minors' First Amendment rights makes the ordinance unconstitutionally overbroad.[11]

■■■ Before proceeding to the merits of the question, we dispose of a preliminary issue regarding potentially confusing terminology. The overbreadth doctrine allows a plaintiff "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Thus, it serves to overcome what would otherwise be a plaintiff's lack of standing. Technically, the overbreadth doctrine does not apply if the parties challenging the statute engage in the allegedly protected expression. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985). This does not mean that plaintiffs cannot challenge an ordinance on its face, however, if the ordinance restricts their own constitutionally protected conduct. Plaintiffs may seek directly on their own behalf the facial invalidation of overly broad statutes that "create an unacceptable risk of the suppression of ideas," *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n. 13, 104 S.Ct. 2839, 2851 n. 13, 81 L.Ed.2d 786 (1984) (internal quotation omitted); thus, whether the "overbreadth doctrine" applies to their First Amendment challenge is more of a technical academic point than a practical concern. *See Waters*, 711 F.Supp. at 1133–34 & n. 15. Thus, we proceed to the merits of the First Amendment challenge to the ordinance's overbreadth without determining whether the ordinance's restrictions on ex-

11. We do not consider plaintiffs' overbreadth challenge based on the substantive due process rights to free movement and interstate travel. The Supreme Court has not applied overbreadth outside the limited context of the First Amendment. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). We decline to do so here. In any event, plaintiffs' equal protection claims, discussed in Part II, provide them the same opportunity to challenge the statute on those grounds. *See Beller v. Middendorf*, 632 F.2d 788, 807–08 (9th Cir.1980) (explaining interrelatedness of two claims despite different doctrinal starting points).

pression burden plaintiffs themselves or only other minors.

 Minors, like adults, have a fundamental right to freedom of expression. *Tinker v. Des Moines Independent Sch. Dist.,* 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). Expression includes speech and expressive conduct. Thus, a facial First Amendment challenge to an ordinance can be brought against regulation of "spoken words" or where a statute by its terms regulates the time, place and manner of expressive or communicative conduct. *Broadrick,* 413 U.S. at 612–13, 93 S.Ct. at 2915–17. Not every ordinance that burdens expressive conduct implicates the First Amendment, however. The Supreme Court has said that where the facial challenge involves conduct rather than speech itself, the ordinance's overbreadth "must not only be real, but substantial as well, judged in relation to [its] plainly legitimate sweep." *Id.* at 615, 93 S.Ct. at 2918. Thus, generally applicable regulations of conduct implicate the First Amendment only if they (1) impose a disproportionate burden on those engaged in First Amendment activities; or (2) constitute governmental regulation of conduct with an expressive element. *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 703–04, 106 S.Ct. 3172, 3175–76, 92 L.Ed.2d 568 (1986).

 The San Diego ordinance is a general regulation of conduct, not speech. It does not disproportionately burden those engaged in First Amendment activities more than it burdens other activities during curfew hours; the curfew applies to minors regardless of whether they seek to exercise their right to free expression. The ordinance does, however, restrict minors' ability to engage in many First Amendment activities during curfew hours.

In applying the Supreme Court's teachings, we have stated that a facial challenge must fail unless, at a minimum, the challenged ordinance " 'is directed narrowly and specifically at expression or conduct commonly associated with expression.' " *Roulette v. City of Seattle,* 97 F.3d 300, 305 (9th Cir.1996) (quoting *City of Lakewood v. Plain Dealer Publishing,* 486 U.S. 750, 760, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988)).

In *Roulette,* we upheld a Seattle ordinance prohibiting sitting or lying on the sidewalk in downtown and in certain neighborhood commercial zones. We reasoned that the ordinance targeted general conduct, not expression. Thus, an overbreadth challenge was inappropriate. We relied on the Supreme Court's statement in *City of Dallas v. Stanglin,* 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989), that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes ... but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." The City's amici argue that the ordinance in this case similarly does not implicate the First Amendment because going out at night does not itself communicate a message. Thus, the City argues that under *Roulette,* the ordinance should not be seen as a restriction on conduct "integral to, or commonly associated with, expression" that is subject to a facial challenge.

We disagree. San Diego's curfew ordinance restricts access to any and all public forums. This all-encompassing restriction was not present in *Roulette,* where we specifically noted that the Seattle ordinance reached only public sidewalks in certain commercial areas and did not reach "public parks, private or public plazas, or alleys, nor sitting on the sidewalk in noncommercial areas of the city." *Roulette,* 97 F.3d at 302. Unlike the Seattle ordinance in *Roulette,* the San Diego ordinance significantly restricts expression in all forums for one-third of each day.

San Diego's broader restriction prohibits conduct that is a necessary precursor to most public expression-thus qualifying as conduct "commonly associated with" expression. *See City of Maquoketa v. Russell,* 484 N.W.2d 179 (Iowa 1992) (reversing convictions under juvenile curfew ordinance). In the circumstance of a restriction of access to all public forums, we find inapplicable the concern we expressed in *Roulette* regarding facial challenges to regulations of particular nonexpressive conduct; unlike the situation in that case, the San Diego curfew ordinance has an integral effect on the ability of minors to

express themselves. Thus, the San Diego ordinance "is directed narrowly and specifically at expression or conduct commonly associated with expression" as required by *Roulette*. 97 F.3d at 305. Accordingly, we conclude that *Roulette* does not preclude a First Amendment facial challenge, and we agree with the Fifth Circuit that First Amendment protections are important in determining the constitutionality of a curfew. *See Qutb*, 11 F.3d at 493–94 (calling the First Amendment exemption the most notable of the important curfew exceptions).

[29] Having concluded a First Amendment facial challenge is permissible, we apply the traditional three-part test to determine whether the ordinance is a reasonable time, place, and manner restriction: (1) it must be content neutral; (2) it must be narrowly tailored to a significant government interest; and (3) it must leave open ample alternative channels for legitimate expression. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989). It is undisputed that the regulation is content neutral. Plaintiffs contend that ordinance fails the other two prongs of the test.

For First Amendment purposes, the physical and psychological well-being of minors is a compelling government interest. *Sable Communications*, 492 U.S. at 126, 109 S.Ct. at 2836–37. Thus, the ordinance must be narrowly tailored to achieve that interest. We hold the ordinance is not narrowly tailored because it does not sufficiently exempt legitimate First Amendment activities from the curfew. The City argues in its brief that "a broad First Amendment expression exception would effectively reduce a curfew ordinance to a useless device." Appellees Br. at 25. This admission destroys an argument that the City narrowly tailored its ordinance to serve its compelling interest in minors' well-being while imposing only a minimal burden on their First Amendment rights. The City did not create a robust, or even minimal, First Amendment exception to permit minors to express themselves during curfew hours without the supervision of a parent or guardian, apparently preferring instead to have no First Amendment exception at all. This is not narrow tailoring. We therefore

need not reach the question of whether the ordinance leaves open adequate alternative channels of expression. The ordinance is not a reasonable time, place, and manner restriction under the First Amendment.

[30] The parties also dispute whether the First Amendment is implicated by the ordinance's restrictions on minors' right of association. The Supreme Court has identified two types of recognized rights of association: (1) intimacy; and (2) "expressive association" for First Amendment activity. *Dallas*, 490 U.S. at 24, 109 S.Ct. at 1594–95. The right to expressive association includes assemblies for non-political purposes, such as social, legal, or economic ones, *Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965), although the Constitution does not provide a generalized right to societal association outside the context of expressive association, *Dallas*, 490 U.S. at 25, 109 S.Ct. at 1595. Plaintiffs attempt to distinguish *Dallas* by arguing that a curfew restricts a far broader range of association than that deemed unprotected in *Dallas*, citing *Waters*, 711 F.Supp. at 1134 n. 16 (not applying *Dallas* for that very reason). We need not reach this issue because of our conclusion that the curfew does not provide any exemption even for "expressive association."

We further decline to address the issue of whether the ordinance unconstitutionally violated the right to free exercise of religion because of our conclusion that the ordinance has other constitutional infirmities.

## IV. PARENTS' RIGHTS TO REAR THEIR CHILDREN.

[31] Examination of the ordinance's burden on the fundamental rights of the minors' parents provides an independent basis for our conclusion that the ordinance, even if construed to avoid vagueness, is nonetheless unconstitutional. It violates the plaintiff parents' substantive due process rights.

[32, 33] The right to rear children without undue governmental interference is a fundamental component of due process. *See Ginsberg*, 390 U.S. at 639, 88 S.Ct. at 1280. Substantive due process under the Fourteenth Amendment "forbids the government

to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling government interest." *Flores,* 507 U.S. at 302, 113 S.Ct. at 1447.

■ The custody, care, and nurture of a child reside first in his or her parents. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972). Parental rights are not absolute, however, and are subject to reasonable regulation. *Runyon v. McCrary,* 427 U.S. 160, 178, 96 S.Ct. 2586, 2598, 49 L.Ed.2d 415 (1976); *Prince,* 321 U.S. at 166, 64 S.Ct. at 442 ("Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, or in many other ways."). The City's interest in the health, safety, and welfare of minors is compelling, as analyzed above.

The district court held that the City's legitimate interests greatly outweighed the limited burden on parental autonomy. The City defends this holding on the grounds that it is a minimal burden to prevent parents only from allowing unsupervised children in public places at night. We disagree. The broad sweep of the ordinance, and the paucity of exceptions to allow unsupervised nocturnal activity, burden the parents just as they do the minors.

The curfew is, quite simply, an exercise of sweeping state control irrespective of parents' wishes. Without proper justification, it violates upon the fundamental right to rear children without undue interference. *See Hodgson v. Minnesota,* 497 U.S. 417, 446–47, 110 S.Ct. 2926, 2943, 111 L.Ed.2d 344 (1990) ("The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to the American tradition."). The ordinance is not a permissible "supportive" law, but rather an undue, adverse interference by the state. *Cf. Bellotti,* 443 U.S. at 638–39 & n. 18, 99 S.Ct. at 3045–46 & n. 18 (finding requirement for parental consultation before abortion is constitutional because, *inter alia,* it supports parents). The ordinance does not allow an adult to pre-approve even a specific activity after curfew hours unless a custodial adult actually accompanies the minor. Thus, parents cannot allow their children to function independently at night, which some parents may believe is part of the process of growing up. *Cf. Qutb,* 11 F.3d at 496 (stating that the broad exemptions in that ordinance, not present in the San Diego ordinance, allow the parents to make decisions for his or her child in many areas). Accordingly, we find the ordinance to be an unconstitutional burden on parents' fundamental rights.

## V. CONCLUSION

We reverse the judgment below because we hold that the ordinance is unconstitutional. When construed in a way that avoids unconstitutional vagueness, it is not narrowly tailored to minimize the burden on minors' fundamental constitutional rights. The district court shall enter judgment for plaintiffs.

REVERSED.